**STARK et al. v. WICKARD.**

No. 8343.

United States Court of Appeals for the
District of Columbia.

Decided June 14, 1943.

Mr. Harry Polikoff, of New York City,
with whom Mr. Walter J. Brobyn, of
Washington, D. C., was on the brief, for
appellants.

Mr. John S. L. Yost, Special Assistant to
the Attorney General, with whom Miss
Margaret H. Brass, Special Attorney, De-
partment of Justice, of Washington, D. C.,
was on the brief, for appellee.

Mr. Charles W. Wilson, of Washington,
D. C., filed a brief as amicus curiae on be-
half of the New England Milk Producers'
Association, urging affirmance.

Before PARKER, Circuit Judge, sitting
by designation, and MILLER and VIN-
SON, Associate Justices.

MILLER, Associate Justice.

Under the Agricultural Marketing Agree-
ment Act of 1937,[1] the Secretary of Agri-
culture issued an amended order,[2] Number
4, effective August 1, 1941, regulating the
handling of milk in the Greater Boston
marketing area. That order is the subject
of dispute in this case. Section 904.7 of
the Order requires the market administrator
—who was appointed by the Secretary, pur-
suant to the Act—to compute the value of
milk sold, distributed, or used, by each
handler of milk who is subject thereto, in

---

[1] 50 Stat. 246, § 8c, 7 U.S.C.A. § 608c.  [2] 7 CFR 904–904.0; 6 Fed.Reg. 3762.

accordance with the formula therein prescribed, and to announce uniform prices per hundredweight of milk delivered during each delivery period. Section 904.4 of the Order establishes minimum prices for milk and requires handlers to pay to producers not less than those prices. Section 904.9 of the Order requires the market administrator to make certain payments[3] to cooperative associations of producers, which the Secretary may determine to be qualified to receive them, in accordance with the provisions of the Order.[4]

Appellants, who were plaintiffs in the District Court, are producers of milk who sell to handlers in the Greater Boston area. These handlers, in turn, are subject to Order No. 4. Appellants are not members of a cooperative association; and many of them voted against adoption of Order No. 4, as amended, when it was submitted to a producers' referendum. In their complaint appellants challenged the action of the Secretary in issuing Order No. 4. They contend that he was without legal authority to incorporate therein Sections 904.9 (a)–(d) and 904.7(b) (5); that these sections are unlawful and void; and, particularly, that the Secretary is without legal authority to make any qualifications of any coopera-

tive association, as eligible for the payments specified in the disputed sections of Order No. 4, or to certify any such association for that purpose. They sought an injunction to restrain him from qualifying, or certifying the qualification of, any cooperative association of producers. They sought, also, a judgment declaring the provisions of Section 904.9(a)–(d) and of Section 904.7(b) (5) to be unauthorized, illegal and void. The trial judge, relying upon the decision of this court in Wallace v. Ganley,[5] decided that appellants were without standing to challenge the validity of the Order; he held that appellants' complaint failed to state a claim upon which relief could be granted, and dismissed the complaint. This appeal followed. The only question which we need decide is whether appellants have standing to seek review of the Secretary's Order. We conclude that they have not.

The Supreme Court has classified the rights which may be the subject of vindication by an action such as the present: " * * * a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege."[6] Appellants do not specify, exactly, either in

---

[3] § 904.9(b) "Payment to Qualified Cooperative Associations. The market administrator shall, upon claim submitted in form as prescribed by him, make payments authorized under paragraph (a), or issue credit therefor out of the cash balance credited pursuant to § 904.7 (b) (5), on or before the 25th day after the end of each delivery period, subject to verification of the receipts and other items on which the amount is based."

[4] § 904.9(a) "Eligibility of Cooperative Associations. Upon application to the Secretary, any cooperative association duly organized under the laws of any State which he determines, after appropriate inquiry or investigation, to be conforming to the provisions of such laws and of the Capper-Volstead Act, as amended, as to character of organization, voting requirements, dividend payments, dealing in products of non-members; to be operating as a responsible producer-controlled marketing association exercising full authority in the sale of the milk of its members; to be systematically checking the weights and tests of milk delivered by its members to plants other than those which may be operated by itself; to guarantee payments to its producers; to be maintaining, either individ-

ually or in collaboration with other qualified cooperative associations, a competent staff for dealing with marketing problems and providing information to its members with whom close working relationships are constantly maintained; to be collaborating with other similar associations in activities incident to the maintenance and strengthening of collective bargaining by producers and the operation of a plan of uniform pricing of milk to handlers; and to be complying with all provisions of this order applicable to such cooperative association, shall be entitled to receive payments in the amount and under the conditions herein specified from the date of qualification, as fixed by the Secretary, until it has been found by the Secretary after notice and opportunity for a hearing, that it has failed to continue to meet any condition or to maintain and exercise the authority or to perform any of the functions required by this section for the receipt or use of such payments."

[5] 68 App.D.C. 235, 95 F.2d 364.

[6] Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, 137, 138, 59 S.Ct. 366, 83 L.Ed. 543; citing Ex parte Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216; City of Walla Walla v. Walla Walla Wa-

their complaint or in their brief, which of the four rights they claim theirs to be. In paragraph three of the complaint they allege that they produce milk and sell it to handlers. Without more, this would identify their rights as arising out of contract; and make applicable to them the language of Wallace v. Ganley:[7] "The only legal rights of the appellees which appear in these cases arise under their contracts with the handlers or distributors of milk. * * * The only violation of rights which could be suffered or threatened would be by breach of contract. But in neither case do the appellees allege that a breach of contract has taken place; nor that the Dairies, who are—with them—parties to their several contracts, have threatened a breach of contract; nor that the threatened enforcement of the act and order by the Secretary will cause the Dairies to break their contracts; nor that the Dairies have notified them that as a result of the act and order the Dairies will pay them less than is provided by their contracts; nor even that the Dairies have notified them that they intend to comply with the order, much less that as a result they will not carry out the terms of their contracts."

But, appellants contend, they are not in exactly the same position as the producers in the Wallace case. There the constitutionality of the Act was challenged. Hence, as the producers placed no reliance upon the Act, they could claim none of its benefits. Consequently, the only rights which could have been reflected by their complaint arose, of necessity, from their contracts. In the present case, appellants assume the validity of the Act, and claim rights arising from it, namely, rights to receive the minimum prices therein provided for. Proceeding upon this assumption, they contend, first, that the formula prescribed by the Secretary, in his order for determining minimum prices, was improper; and, second, that they, as beneficiaries under the Act, are empowered to challenge that order by means of the proceeding which they initiated in the present case. Presumably, therefore, appellants are assuming a right "founded on a statute which confers a privilege."[8]

■■ Coming, then, to an examination of this assumption, and conceding its validity, solely for the purpose of argument, it will be noted that Congress made no provision in the Agricultural Marketing Agreement Act for review, upon the petition of milk producers, even in the capacity of "private .Attorney Generals,"[9] or as "King's proctors," to vindicate the public interest;[10] as it has done in some of its enactments during recent years.[11] Appellants recognize this fact and contend, as a consequence, that the only means which they have of asserting their rights is by a complaint for injunction, as they have done in the present case. They argue that "the equalization pool" belongs to the producers, because it is derived from the sale of milk which they produce; hence, that "they must have standing to protect their own property"; that the handlers have no financial interest in the fund, and that the government has no proprietary or possessory rights therein. They conclude that "appel-

ter Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341; American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; Scully v. Bird, 209 U.S. 481, 28 S.Ct. 597, 52 L.Ed. 899; Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570; Lane v. Watts, 234 U.S. 525, 34 S.Ct. 956, 58 L.Ed. 1440; Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283; Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061.

[7] Wallace v. Ganley, 68 App.D.C. 235, 237, 95 F.2d 364, 366.

[8] Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, 137, 138, 59 S.Ct. 366, 369, 83 L.Ed. 543.

[9] Associated Industries of New York State v. Ickes, 2 Cir., 134 F.2d 694.

[10] See Edgerton, J., concurring in Colorado Radio Corp. v. Federal Communications Commission, 73 App.D.C. 225, 118 F.2d 24, 28.

[11] See, generally, Mr. Justice Douglas, dissenting in Federal Communications Commission v. National Broadcasting Co., 63 S.Ct. 1035, 87 L.Ed. ——, decided May 17, 1943; Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Scripps-Howard Radio, Inc., v. Federal Communication Comm., 316 U.S. 4, 14, 15, 62 S.Ct. 875, 86 L.Ed. 1229; Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 268, 269, 60 S.Ct. 561, 84 L.Ed. 738; Federal Trade Comm. v. Klesner, 280 U.S. 19, 27, 50 S.Ct. 1, 74 L.Ed. 138, 68 A.L.R. 838; Virginian Ry. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789.

lee's agent is definitely in the position of an official trustee diverting a fund away from the statutory purpose for which the monies involved should have been paid," namely, to them, as the producers to whom they contend it belongs; hence, that "the producers who own the fund can enjoin its dissipation." Appellants emphasize, also, the injury which, they say, will result to them, unless the relief sought is granted. But it is not sufficient to show lack of remedy or injury, in order to challenge administrative action, when vindication is sought of rights founded on a statute which confers a privilege, but fails to give a right of review.[12] The doctrine, which has been worked out by the Supreme Court in a series of recent decisions, was summarized by Judge Frank, speaking for the Second Circuit, in the Associated Industries case:[13] "In a suit in a federal court by a citizen against a government officer, complaining of alleged past or threatened future unlawful conduct by the defendant, there is no justiciable 'controversy', without which, under Article III, § 2 of the Constitution, the court has no jurisdiction, unless the citizen shows that such conduct or threatened conduct invades or will invade a private substantive legally protected interest of the plaintiff citizen; such invaded interest must be either of a 'recognized' character, at 'common law' or a substantive private legally protected interest created by statute. In other words, unless the citizen first shows that, if the defendant were a private person having no official status, the particular defendant's conduct or threatened conduct would give rise to a cause of action against him by that particular citizen, the court cannot consider whether the defendant officer's conduct is or is not authorized by statute; for the statute comes into the case, if at all, only by way of a defense or of justification for acts of the defendant which would be unlawful as against the plaintiff unless the defendant had official authority, conferred upon him by the statute, to do those acts. Unless, then, the citizen first shows that some substantive private legally protected interest possessed by him has been invaded or is threatened with invasion by the defendant officer thus regarded as a private person, the suit must fail for want of a justiciable controversy, it being then merely a request for a forbidden advisory opinion. That the plaintiff shows financial loss on his part resulting from unlawful official conduct is not alone sufficient, for such a loss, absent any such invasion of the plaintiff's private substantive legally protected interest, is damnum absque injuria. Thus, for instance, financial loss resulting from increased lawful competition with a plaintiff, made possible solely by the defendant official's unlawful action, is insufficient to create a justiciable controversy. More is required 'than a common concern for obedience to law.'"

■■ United States v. Rock Royal Coop. Inc.,[14] and Thompson v. Deal,[15] upon which appellants rely, do not support their contention. There is no reason to impress a trust upon the fund here involved. Appellants are not in any real sense the equitable owners of the fund. The only right which they have with respect to it is that which they may assert against the handlers, under their contracts for sale and purchase of milk. In all other respects, their standing to sue is no different, and no greater, than is that of citizens generally.[16] True it is that the Agricultural Marketing Agreement Act was passed for the benefit of milk producers; but it was also passed for the benefit of milk consumers, handlers, and the public, generally. The fact that one person or group of persons may benefit, or were intended to benefit from its operation, does not confer upon them, without more, the power or privilege of directing the law's administration. Here, unlike the Thompson case,[17] the suit is one in which the court is asked to interfere with the official discretion of a government officer.

We conclude that the decision of the District Court was correct.

Affirmed.

---

[12] Perkins v. Lukens Steel Co., 310 U. S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108.

[13] Associated Industries of New York State v. Ickes, 2 Cir., 134 F.2d 694, 700. And see authorities there cited.

[14] 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

[15] 67 App.D.C. 327, 92 F.2d 478.

[16] See Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 129, 60 S.Ct. 869, 84 L. Ed. 1108; Stearns v. Wood, 236 U.S. 75, 78, 35 S.Ct. 229, 59 L.Ed. 475; Fairchild v. Hughes, 258 U.S. 126, 129, 130, 42 S.Ct. 274, 66 L.Ed. 499.

[17] 67 App.D.C. 327, 332, 92 F.2d 478, 483.

Mr. Justice VINSON sat during the argument of this case; concurred in the result when it was considered in conference, but resigned from the Court before the opinion was prepared.